PREET BHARARA
United States Attorney
Southern District of New York
By:     ELLEN LONDON
Assistant United States Attorney
86 Chambers Street, 3rd Fl.
New York, NY 10007
Tel.: (212) 637-2737
Fax: (212) 637-2702
Email: Ellen.London@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* SHARON SHADIC, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | |
| : | |
| UFC AEROSPACE, UNITED FASTENER : | 12 Civ. 2594 (WHP) |
| CO., INC. and DOUGLAS B. DAVIS, : | |
| : | AMENDED COMPLAINT |
| : | IN INTERVENTION OF |
| : | THE UNITED STATES OF AMERICA |
| Defendants. : | |

----------------------------------------------------X

UNITED STATES OF AMERICA,                            :
                                                     :
                Plaintiff,                           :
                                                     :
        v.                                           :
                                                     :
UFC AEROSPACE LLC and                                :
DOUGLAS B. DAVIS,                                    :
                                                     :
                Defendants.                          :
----------------------------------------------------X

Plaintiff United States of America (the "United States" or the "Government"), by its

attorney, Preet Bharara, United States Attorney for the Southern District of New York,  alleges

upon information and belief as follows:

INTRODUCTION

1.      This is a civil fraud lawsuit by the United States to recover damages and penalties from defendant UFC Aerospace LLC ("UFC"), and UFC's former President, Douglas B. Davis ("Davis"), under the False Claims Act and common law arising from Defendants' misrepresentations of UFC as a woman-owned small business ("WOSB") in order to obtain government contracts.

2.      As described more fully below, UFC certified that it was a WOSB to large government contractors, knowing that these contractors were funded by the federal Government, and knowing that it was not in fact a WOSB.  UFC made these misrepresentations because it believed that WOSB status provided a competitive advantage in obtaining these lucrative contracts.

3.      The government contractors were statutorily required to attach subcontracting plans to its contracts with the Government, listing, among other items, the amount of WOSB work that they were providing.  These subcontracting plans were a material part of the contracts at issue by law.  Moreover, the accuracy of these subcontracting plans was important in practice to both the contractors and to the Government.

4.      As a result of the fraud, Defendants obtained millions of dollars of work on federal contracts to which they were not entitled.

JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331, 1345, over the remaining claims pursuant to 28 U.S.C. § 1345, and over all claims pursuant to the Court's general equitable

jurisdiction.

6.      Venue lies in this District pursuant to 31 U.S.C. § 3732(a), because during the

relevant time period covered by this complaint during which Defendant UFC was a New York

corporation, Defendant UFC "c[ould] be found" within this District, and pursuant to 28 U.S.C.

§ 1391(c) because during the relevant time period covered by this complaint, Defendant UFC

was subject to personal jurisdiction within this District.

PARTIES

7.      Plaintiff is the United States of America.

8.      Defendant UFC Aerospace LLC is a company engaged in the business of

distributing consumable materials to the aerospace and defense industries.  It is located at 3411

Silverside Road, Wilmington, Delaware 19810.  Prior to becoming a Delaware limited liability

corporation, and during the times relevant to the allegations in this complaint, UFC Aerospace

LLC was a New York corporation with its registered agent located in this District.

9.      Defendant Douglas B. Davis is the former president of UFC.

FACTUAL BACKGROUND

A.  Statutory Requirements for WOSB Certification and WOSB Contracting

10.      The Federal Acquisition Streamlining Act of 1994, Public Law 103-355, set goals

for the participation of small business concerns owned and controlled by women for prime and

subcontract awards.

11.      The Equity in Contracting for Women Act of 2000 (the "Women's Act"), codified

at 15 U.S.C. § 637(m), was enacted to allow for greater representation of women-owned small

businesses in historically underrepresented industries.

12.     In addition to meeting the criteria to be considered a small business concern, there are two requirements for WOSB classification: "(1) at least 51 percent of [the] small business concern is owned by one or more women or, in the case of any publicly owned business, at least 51 percent of the stock [ ] is owned by one or more women; and (2) the management and daily business operations of the business are controlled by one or more women."  15 U.S.C. § 632(n).

13.     Congress specifically directed that any small business concern that is found to have "misrepresented the status of that concern as a small business concern owned and controlled by women" shall be subject to the penalties set forth in the False Claims Act.  15 U.S.C. § 637(m)(5)(C).

14.     Congress has emphasized the importance of ensuring that government contracts are assigned to WOSB contractors by establishing an annual goal of "not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year."  15 U.S.C.  §644(g)(1)(A)(v).

15.     Further, the Small Business Act provides that "[i]t is the policy of the United States that small business concerns, … and small business concerns owned and controlled by women, shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency, including contracts and subcontracts for subsystems, assemblies, components, and related services for major systems."  15 U.S.C. § 637(d)(1).

16.     To accomplish this requirement, prime contractors are required to negotiate with the procuring authority a subcontracting plan on how the contractor will provide opportunities for small businesses, WOSBS and other designated small businesses.  *Id*. at § 637(d)(4).  The subcontracting plan "shall be included in and made a material part of the contract," *id*., and the

4

"failure of any contractor or subcontractor to comply in good faith" with a subcontracting plan "shall be a material breach of such contract or subcontract," *id*. at § 637(d)(9).

B.  Importance of WOSB Status to the Government

17.  UFC's claimed WOSB status was important both to customers and the Government.

18.  The Comprehensive Subcontracting Plan Group ("CSPG") of the Defense Contract Management Agency ("DCMA") is responsible for ensuring that Government defense contractors meet all of the requirements for hiring small businesses, including WOSBs.

19.  These CSPG employees work full time with Government contractors in what is typically a year-long process for each contract that begins with plans submitted by the contractors, followed by negotiations between the parties regarding the plans — including the extent to which the plans provide for the hiring of WOSB subcontractors — and culminating in approval of the plans by the CSPG.

20.  The CSPG then conducts annual reviews of the contractors, looking at samples of the subcontractors employed to ensure that, where appropriate, they are WOSBs; if the CSPG identifies a discrepancy, DCMA's practice is to disallow the dollars paid to the contractor for that particular subcontractor's work unless and until the discrepancy is resolved.

21.  At the end of the process, the contractors are given a rating, and these ratings may then be used in ranking the contractors in the decisions regarding whether to award future Government contracts.

C.  The Fraudulent Scheme

22.  UFC began claiming WOSB status as early as 2001.  Specifically, in December of

5

2001, UFC issued a letter to a large Government contractor stating that it was a WOSB because (1) Kristine and Catherine Davis owned the majority of UFC's common stock in their roles as co-trustees of the John Davis Family Heritage Trust and the Douglas Davis Family Heritage Trust and (2) "both Kristine Davis and Catherine Davis are officers of UFC Aerospace, Corp., and participate as such."

23.    UFC continued making representations that it was a WOSB to Government contractors after 2001.  Specifically, it represented itself as a WOSB to one large Government contractor at various time periods beginning in 2001 and continuing through 2011.  With regard to another large Government contractor, UFC made the WOSB representation in 2001, and that contractor continued to list UFC as a WOSB for the entire time period until the end of 2010; UFC never ensured that this contractor changed its status from WOSB during this time period, even when it was not actively making the representation.

*Contrary to the Company's Representations, No Woman Ever Owned a Majority of UFC*

24.    The claims that UFC was a WOSB were false because UFC was never 51% owned by Kristine and/or Catherine Davis.  As explained further below, John and Douglas Davis at all times exercised all control and ownership of the company, and their reliance on certain trusts listing Kristine and Catherine Davis as lifetime beneficiaries was without any basis given the plain language of the trust documents which made it clear that the women's role was limited at best.

25.    As of February 2000, there were 200 shares of UFC stock, of which 198 were Class B nonvoting stock and 2 were Class A voting stock.  Douglas Davis held 0.98 Class A voting shares and 97.02 Class B nonvoting shares, and John Davis held the remaining 1.02 Class

6

A and 100.98 Class B shares.

26.     John and Douglas Davis created, respectively, the John Davis Family Heritage

Trust and the Douglas Davis Family Heritage Trust in 2000; as noted above, these trusts were

used to claim WOSB status beginning in 2001.

27.     These trusts listed Kristine or Catherine Davis as "lifetime beneficiaries," which

was the first time that any women had any ownership interest involving UFC stock.

28.     John and Douglas Davis caused the John Davis Family Heritage Trust to hold

100.98 of UFC's 198 outstanding Class B shares, and the Douglas Davis Family Heritage Trust

to hold the remaining 97.02 shares of outstanding Class B stock.

29.     During the subsequent years (until 2005, as explained below), John Davis

continued to hold 1.02 Class A voting shares, and Douglas Davis continued to hold the

remaining .98 Class A voting shares.

30.     While John and Douglas Davis used the trusts to claim women ownership, the

trusts fell far short of creating 51% ownership on the part of the women.

31.     As lifetime beneficiaries of the trusts (Kristine for the John Davis Trust and

Catherine for the Douglas Davis Trust), the women were each entitled to no more than annual

withdrawals of $5,000 or 5% of the assets of the trusts in addition to income distributions, per

the absolute discretion of the trustees.

32.     The creators or grantors of the respective trusts (John Davis and Douglas Davis)

could also, at their discretion, withdraw all assets from the trust, so long as the assets were

replaced with other assets of comparable value.  This included the ability to withdraw the trusts'

stock ownership in UFC and to replace it with other assets.

33.     The trusts also provided that both women could be removed as trustees without cause and at the sole discretion of John and Douglas Davis.  Thus, any power that Kristine and Catherine had over the business assets included in the trusts could be eliminated at any time by their respective husbands.

34.     UFC's letter to a Government contractor sent in 2001, referenced in paragraph 21 above, did not provide any of these details about the trusts.  Most importantly, UFC's claim that Kristine and Catherine owned a majority of the company's stock was false because, as explained above, neither Kristine nor Catherine actually owned the stock through the two trusts, and all of the other stock was owned by John and/or Douglas Davis.

35.     UFC's ownership structure remained as described above until 2005, when John Davis died.

36.     Douglas Davis thereupon received 100.98 of the John Davis Family Heritage Trust's Class B shares, and John Davis's estate transferred the 1.02 Class A voting shares to him as well.  Accordingly, as of sometime in 2005, Davis owned 103 of the 200 outstanding shares of UFC Class B stock.

37.     There were no stock transfers between 2005 and late 2007.

38.     In March of 2007, Kristine Davis passed away, which did not cause any change in the ownership of UFC.

39.     In November of 2007, the Douglas Davis Family Heritage Trust transferred its 97.02 Class B shares to Catherine Davis, representing the first time that Catherine Davis had any outright ownership of UFC stock.  However, as the owner of 97.02 of 200 outstanding shares, Catherine Davis still was not a 51% owner of UFC.

8

40.     Following this transfer, the ownership structure of UFC remained unchanged until the subsequent sale of the company to B/E Aerospace.

*During the Relevant Time, Douglas Davis Controlled and Managed UFC*

41.     Contrary to UFC's representations, Douglas Davis actually controlled and managed the company during the entire time period at issue.

42.     Neither Kristine nor Catherine Davis played a day-to-day role at UFC during the relevant time period.

43.     Specifically, neither Kristine nor Catherine Davis spent time in the office on any kind of regular basis.

44.     Indeed, neither woman had an office at the company during the relevant time period.

45.     Neither Kristine nor Catherine Davis ever had UFC email accounts.

46.     Neither Kristine nor Catherine Davis attended formal UFC meetings.

47.     UFC employees clearly understood that they reported to, and took directions from, Douglas Davis.

*UFC Used Its False WOSB Status to Gain a Competitive Advantage*

48.     UFC and Davis were well aware that being a WOSB would provide a competitive advantage because of the program's importance to the Government.

49.     For example, in the minutes from a January 2002 UFC officers' meeting, one of the UFC officers discussed the fact that UFC's claimed WOSB status would provide an "incentive for [customers] to favor UFC."

50.     UFC was aware of the requirements for claiming WOSB status (which it in fact

did not meet), and its officers perceived WOSB status as an advantage.

    D.   <u>UFC's Profits From Government-Funded Contracts</u>

       51.    During the relevant time period, during which UFC misrepresented itself as a WOSB, it earned millions of dollars from contracts with companies it knew were being funded by the United States.

       52.    Specifically, UFC earned approximately $30 million from one large Government contractor, for periods of time in which UFC misrepresented that it was a WOSB, and approximately $18 million from another large contractor, as to which UFC misrepresented that it was a WOSB and failed to correct this status until 2010.

## FIRST CLAIM

**Violations of the False Claims Act: Presentation of False Claims**
**(31 U.S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A))**

       53.    The United States incorporates by reference paragraphs 1-52 as if fully set forth in this paragraph.

       54.    The United States seeks relief against Defendants under Section 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A) of the False Claims Act.

       55.    As set forth above, in connection with the foregoing schemes, Defendants knowingly, or with reckless disregard for the truth, presented and/or caused to be presented false or fraudulent claims for payments to Government contractors, which are recipients of federal funds, and such funds were spent or used by these contractors on the Government's behalf and to advance the Government's interest.

       56.    By reason of these false claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law

for each violation.

## SECOND CLAIM

**Violations of the False Claims Act: Making or Using a False Record or Statement
(31 U.S.C. § 3729(2)(2006) and, as amended, 31 U.S.C. § 3729(a)(1)(B))**

57.    The United States incorporates by reference paragraphs 1-52 as if fully set forth in
this paragraph.

58.    The United States seeks relief against Defendants under Section 3729(a)(2), and,
as amended, 31 U.S.C. § 3729(a)(1)(B).

59.    As set forth above, in connection with the foregoing schemes, Defendant
knowingly, or in reckless disregard for the truth, made, used, and caused to made and used, false
records and statements material to false and fraudulent claims that were made to the Government
in the form of the subcontracting plans submitted by the Government contractors.

60.    By reason of these false claims, the United States has sustained damages in a
substantial amount to be determined at trial, and is entitled to a civil penalty as required by law
for each violation.

## THIRD CLAIM

### Unjust Enrichment

61.    The United States incorporates by reference paragraphs 1-52 as if fully set forth in
this paragraph.

62.    By reason of the payments to defendants, Defendants were unjustly enriched.  The
circumstances of Defendants' receipt of the subcontracts at issue are such that, in equity and
good conscience, Defendants should not retain the benefits of these subcontracts, the amount of
which is to be determined at trial.

11

# FOURTH CLAIM

## Common Law Fraud

63.     The United States incorporates by reference paragraphs 1-52 as if fully set forth in this paragraph.

64.     Defendants made material misrepresentations of fact, with knowledge of, or in reckless disregard of, their truth, in connection with the claims for payment submitted by, or on behalf of, Defendants to the United States.

65.     Defendants intended that the United States rely upon the accuracy of the false representations referenced above.

66.     The United States made substantial payments of money in justifiable reliance upon Defendants' false representations.

67.     Defendants' actions caused the United States to be damaged in a substantial amount to be determined at trial.

WHEREFORE, plaintiff, the United States, requests that judgment be entered in its favor and against Defendants as follows:

On the First and Second Claims for Relief (Violations of the False Claims Act, 31 U.S.C. § 3729(a)), for treble the United States' damages, in an amount to be determined at trial, plus civil penalties for each false claim presented;

On the First and Second Claims for Relief, an award of costs pursuant to 31 U.S.C. § 3729(a);

On the Third and Fourth Claims for Relief, in an amount to be determined at trial,

together with costs and interest; and

awarding such further relief as is proper.

Dated:  New York, New York
        October 5, 2015

                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for Plaintiff
                              United States of America

        By:

                              ELLEN LONDON
                              MARA E. TRAGER
                              Assistant United States Attorneys
                              86 Chambers Street
                              New York, New York  10007
                              Telephone:  (212) 637-2737
                              Facsimile:  (212) 637-2702
                              ellen.london@usdoj.gov

13